IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHRISTOPHER JACOB,

                        Plaintiff,                          OPINION AND ORDER

        v.                                                      17-cv-196-wmc

KAREN ANDERSON and
DR. SULIENE,

                        Defendants.

        *Pro se* plaintiff Christopher Jacob, who is currently incarcerated at Oshkosh

Correctional Instiuttion, filed this lawsuit under 42 U.S.C. § 1983, challenging the medical

treatment he received while incarcerated at Columbia Correctional Instiuttion

("Columbia").  The court granted Jacob leave to proceed against Columbia employees

Karen Anderson, Columbia's Health Services Unit ("HSU") manager, and Dr. Dalia

Suliene, a physician, on claims that their handling of Jacob's intolerance to non-steroidal

anti-inflammatories ("NSAID's") violated his rights under the Eighth Amendment, as did

their treatment of his lower back pain more generally.  Now before the court is defendants'

motion for summary judgment (dkt. #30), which the court will grant in part and deny in

part.

        The motion will be denied with respect to claims arising out of prescribing Jacob a

type of NSAID Salsalate, in April and May of 2012, since Jacob claims that he explicitly

reported his intolerance and serious past adverse reaction to that medication.  However,

defendants' motion will be granted in all other respects, since defendant Anderson was not

in a position to question Dr. Suliene's decision to prescribe Salsalate, and no reasonable

jury could find that either defendant acted unreasonably in treating plaintiff's chronic back pain in any other respect, much lesss with deliberate indifference.

UNDISPUTED FACTS[1]

**A.  Parties**

Plaintiff Christopher Jacob was incarcerated at Columbia from March 21, 2011, to April 23, 2015, where the defendants, Dr. Suliene and Nurse Karen Anderson, were working.  Dr. Suliene was employed in her capacity as a physician and worked at Columbia from January 3, 2006, until April 5, 2013.  She is now retired.  Karen Anderson is a registered nurse, and from December 4, 2011, to January 12, 2014, she was employed at Columbia as the Health Services Manager ("HSM").  She, too, is now retired.

**B.  Health Service Unit Procedures and Practices**

When an inmate has a medical concern he wishes to raise with the Health Services Unit ("HSU"), the inmate may fill out a Health Service Request ("HSR") form and submit it to the HSU.  If an inmate feels he needs to be seen right away, he may request a sick call by submitting a form, DOC-3035.  HSRs are triaged once daily by nursing staff, as are DOC-3035 requests for sick call.  This includes HSRs directed specifically to HSM Anderson.  This system is intended to ensure that inmates with the most urgent medical

---

[1]  Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

issues see the first available physician or nurse practitioner.  When symptoms and issues are raised that do not require evaluation of a doctor, nursing staff typically work with the patient to rule out simple causes and find a solution through education and over-the-counter medications that nursing staff can distribute.  The practice of having a nurse be the first person to attempt to solve non-urgent medical issues is typical, both within the institution setting and in the larger medical community.

If medically indicated, nurses at Columbia may also provide interventions in accordance with nursing protocols.  Appropriate interventions for back pain that nursing staff may provide include heat and/or ice therapy, Tylenol, ibuprofen and muscle rub cream.

Dr. Suliene was not responsible for scheduling appointments with inmates.  In general, HSM Anderson was not involved in direct patient care, nor was she responsible for providing medications or scheduling patient appointments with physicians.

### C.  Jacob's medical treatment

Jacob met with Dr. Suliene for his chronic back pain on April 17, 2012.  At that time, Jacob's intolerance to NSAIDs was documented in Jacob's medical records at Columbia, but the parties dispute whether his records specifically listed Salsalate as an allergen.  According to Jacob, as of December 2010, his DOC-3020 form, entitled "Problem List," included the following entry under Allergies:  "Intolerant to NSAIDS/Salsalate." (Sec. Decl. of Jacob (dkt. #50) ¶ 3; Jacob Decl., Ex. 4 (dkt. #40-3).)  However, Dr. Suliene attests that when she first reviewed Jacob's medical records before their April 2012

3

appointment, his DOC-3020 form did not include the "/Salsalate."

During the original examination, Jacob reported back pain for the past three months and that he had seen a chiropractor some three-and-a-half years ago for back pain. Jacob also told Dr. Suliene that his back pain started within Columbia after he lost a second mattress, and he asked Dr. Suliene for more comfortable shoes. During that first appointment, Dr. Suliene noted that Jacob was "morbidly obese"; she recommended Jacob lose weight; she referred him to have his shoes evaluated; and she discussed giving him a different prescription other than ibuprofen. Dr. Suliene also placed a request for a thick mattress and low bunk for his back pain; an x-ray of his low back; and an order for Salsalate 60-500 mg tablets, as needed for six months.

Dr. Suliene did not include a note that Jacobs reported being allergic to Salsalate, and Dr. Suliene attests that if Jacob had reported an allergy to Salsalate, she would not have prescribed it to him or told him to take it. Jacob disputes this, claiming that Dr. Suliene should have been aware that he could not tolerate Salsalate because his medical record specifically noted his intolerance. Further, Jacob attests that he told Dr. Suliene during the appointment that he could not tolerate Salsalate and asked her to check his medical files to confirm. (Second Decl. of Jacob (dkt. #50) ¶ 4.)

Dr. Suliene believes her decision was acceptable, both as a method to treat Jacob's pain and despite his history of intolerance to NSAIDs. Dr. Suliene attests the goal in treating chronic back pain is not necessarily to make the patient pain free; rather, the goal is to minimize the pain through self-care, ice, physical therapy to strengthen muscles, exercises ordered by a physical therapist or doctor, and medication, if necessary. She

further attests that the standard care for chronic low back pain can begin with non-drug therapy, which would include heat and/or cold applications, physical therapy, stress reduction, efforts at weight loss, and changing activities to reduce discomfort.  Finally, Dr. Suliene explains that NSAIDs are an appropriate first approach if pain medications are warranted.

As for her decision to prescribe Salsalate in particular, Dr. Suliene attests that she knew Jacob did not tolerate NSAIDs well, but at that time believed it was appropriate for Jacob to try Salsalate.  Dr. Suliene also attests that patients react differently to different NSAIDs, and the reason for the differences is not known.  An adverse reaction may occur because a patient's body does not tolerate a certain type of medication, or there might be a situational circumstance (such as an ulcer) that makes a patient unable to tolerate a medication.  According to Dr. Suliene, therefore, it may even be appropriate for a patient to retry a medication despite a previous intolerance, to see if the patient's circumstances have changed, and he is now able to tolerate the medication.  Furthermore, Dr. Suliene explains that an intolerance and an allergy to NSAIDs are two different reactions.  While an intolerance may be the product of several circumstances (such as taking it on an empty stomach, taking it with food, or a combination of things, like not enough fluid), an allergic reaction or hypersensitivity may include rash, hives, itching, swelling in the throat, shortness of breath, nasal congestion, wheezing or feeling faint.  (Suliene Decl. (dkt. #33) ¶ 39.)  Dr. Suliene's view is that: if a patient is sensitive to a medication, he may be prescribed an alternative prescription; and if that prescription does not work or there is an adverse effect, then the medication should be discontinued.

Dr. Suliene further explains that Salsalate is an older medication, is not used as often as other NSAIDs, is generally better tolerated than other NSAIDs, and carries a lower risk of bleeding. As a result, people who do not tolerate NSAIDs well can often tolerate Salsalate. In particular, Dr. Suliene felt it was appropriate for Jacob to try Salsalate to see if it would help with his back pain, so she prescribed a low dose. At the time, she believed that if Jacob could not tolerate it (or if Jacob experienced unpleasant side effects), she could change the medication. In addition, Dr. Suliene attests that there were no other NSAIDs available for Jacob to try at the time, since there were several other medications he was unable to tolerate.

On April 24, 2012, Jacob underwent an x-ray of his back, which showed a normal lumbar spine. On May 7, 2012, Jacob directed the following letter to HSM Anderson:

> I recently saw the doctor concerning the pain in my back that makes it difficult to get out of bed. She prescribed me the medication called SALSALATE. Though I am gr[a]teful that a medication was prescribed to me I must inform you as I did her that I am allergic to NSAIDs. When I told her that she told me to take them anyway. The last time I did that I ended up in the emergency room vomiting up blood, dizzy, disoriented, with a massive amount of pain in my stomach. I will take them if you agree with the doctor that I should. I only wanted to inform you of what happened last time so that if it happens again you know what[']s going on and why. I have also informed my family of the medication and what could happen if I take it just so they know if something happens. As stated before if you wish me to begin taking the medication please respond ASAP and I will start then. If not please have the doctor set up a new appointment for me to come up there and get a different medication for my back.

(Ex. 500 (dkt. #35-1) 4.)

Anderson does not recall reviewing this letter, but the letter was provided to Dr.

Suliene, who attests that as of May 7, Jacob had other options available for pain relief, including Tylenol, requesting physical therapy, or trying the Salsalate as prescribed. She believed the latter remained a viable option because Jacob had not reported taking it since she prescribed it, so at least Jacob could still try it to determine whether he could tolerate it. Moreover, reasoning that Jacob could decline to take the medication, Dr. Suliene did not believe any response was necessary, and so she did not respond to his letter.

### D. Jacob's June 2012 reaction to Salsalate and successful inmate complaint

On June 15, 2012, Jacob took two Salsalate pills and suffered a severe reaction, including vomiting blood and feeling an intense burning sensation in his intestines. Jacob further alleges that even though an officer called HSU on his behalf, no one saw him. Ultimately, his pain continued for three days.

On June 24, 2012, Jacob submitted an inmate complaint, which alleged that: he had informed his doctor, HSM Anderson, and his psychologist that he was allergic to all NSAIDs; he was nevertheless prescribed Salsalate, which is an NSAID; he took two Salsalate after lunch on June 15, 2012, because his back hurt; and he suffered a severe reaction. An Institution Complaint Examiner ("ICE") reached out to HSM Anderson about Jacob's allegations. Anderson disputed that Jacob had informed HSU at any time between April 17 (the date the Salsalate was ordered) and June 15, 2012, that he was experiencing any side effects of Salsalate. She also pointed out that being allergic to a medication and having an intolerance to a medication are two different things. Anderson further relayed to ICE that Jacob was prescribed Salsalate because of his sensitivity to *other*

7

over the counter medications.

Additionally, Anderson now attests that she does not recall whether she was working at the institution on June 15, 2012, but even if she were, she did not field phone calls from officers. Instead, a nurse would have answered a call from the officer. Moreover, no incident report was created related to Jacob's claimed June 15, 2012, adverse reaction, and there is no notation in his chart about that event. Regardless, Anderson attests that she would not have made the decision whether to call Jacob to the HSU that day; rather the decision would have been made by the nurse triaging those calls. (Anderson Decl. (dkt. #34 ¶ 36.)

On June 29, 2012, ICE recommended dismissal of the inmate complaint, noting that: Jacob had not submitted a written HSR about the Salsalate prescription before the June 15, 2012, incident; and Jacob should have contacted HSU if he required an alternative treatment for back pain. However, on July 12, 2012, the Reviewing Authority parted ways with the ICE, affirming Jacob's complaint (CCI-2-12-13041), finding that:

> On the day in question, the patient asked verbally to be seen and was instructed to submit a health services request. He reported that he was vomiting and had pain. It is unfortunate that the patient did not submit a health services request. Nursing staff, when notified that the patient was experiencing side effects from a medication that he may have had an intolerance to, did not see the patient nor did they document any telephone contact from the officer on the housing unit. Based on this, it is recommended that this complaint be affirmed.

(Ex. 501 (dkt. #35-2) 4.) The Corrections Complaint Examiner also agreed that the complaint should be affirmed, and on August 28, 2012, the Office of the Secretary affirmed it.

### E.  Jacob's efforts to get other medication for back pain

On July 1, 2012, Jacob submitted an HSR that stated, "As I informed the Doctor I am very allergic to NSAIDs and did not do well with Salsalate.  I ask that I be given something else for my back pain." (*Id.* at 5.)  On July 3, Dr. Suliene responded that, in addition to Salsalate, Jacob could have APAP (or Mapap, acetaminophen products such as Tylenol) as needed for back pain, and that Dr. Suliene could prescribe him gabapentin as well.  At the time, Dr. Suliene attests that Jacob's statement that he "did not do well with Salsalate" did not suggest to her that Jacob could not also try Salsalate again to rule out unpleasant side effects.

On July 7, 2012, Jacob submitted two more HSRs, requesting another medication besides gabapentin and explaining that when he had taken gabapentin in the past, he had an adverse reaction, including diarrhea, kidney pain and blood in his urine.  On July 9, Dr. Suliene responded, reiterating that Jacob could again take Salsalate for back pain and agreeing not to prescribe him gabapentin, while also expressing doubt that gabapentin had caused his symptoms.

On July 16, 2012, Jacob submitted a letter to HSM Anderson, reporting, among other things, a bad reaction to Salsalate:

> I have been suffering from back pain ever since my second mattress was taken earlier this year.  Since then I have been working with HSU to find a medication that will work for me. First I was given SALSALATE and had a severe allergic reaction to it.  I was vomiting blood, dizzy, had severe pain/burning sensation in my stomach, and blood in my stool for about 3 days.  After that I wrote to HSU asking to be put on something else that I wasn't allergic to.  They replied stating that they

> were going to put me back on GABAPENTIN.  The problem with that is that they took me off GABAPENTIN last November because I was developing a reaction to that as well. . . .  I wrote HSU reminding them of why they took me off GABAPENTIN in the first place.  They responded stating that not only should I take the GABAPENTIN but that I should also start taking SALSALATE again.  I understand that I'm not a doctor but I don't think it would be wise to take 2 medications that I am allergic to.

(*Id.* at 8.)

HSM Anderson responded to this letter on July 24, 2013, informing Jacob that he should change to APAP three times daily and submit an HSR with any other concerns. (Ex. 500 (dkt. #35-1) 8.)  Anderson attests that she would also have consulted with an advanced care provider before responding.  Although Dr. Suliene does not recall these particular events, she attests that if she were involved, it would not have been necessary for her to discontinue the Salsalate prescription formally because there were no more refills on the prescription nor adverse reactions reported after that date.  On August 12, Jacob next submitted an HSR complaining of back pain and that the Mapap he was taking did not help.  Jacob also asked to see a doctor.  That day, non-defendant nurse Valerius wrote back that:  the Salsalate had not been reordered; he should take his Mapap as ordered; and he was scheduled to be seen.

On September 14, 2012, Dr. Suliene saw Jacobs in the HSU.  Jacob claims that he again told Dr. Suliene that he was intolerant to NSAIDs, including Salsalate, and detailed an episode of flushing and bleeding (presumably, the June event).  Jacob also asked for an extra mattress, which Dr. Suliene explained was not available at the institution.  As a result of that visit, Dr. Suliene made a plan to continue Jacob on APAP and to order physical

10

therapy for strengthening.  However, Dr. Suliene attests that she was still unaware that Jacob had reported a bad reaction to Salsalate until this September 14 appointment, and she agrees that discontinuing it due to the reaction was appropriate.  As a result, on that date, Dr. Suliene added to Jacob's progress notes and Problem List form his intolerance to Salsalate.  (Sec. Decl. of Suliene (dkt. # 41) ¶ 6.)

Later that day, Jacob submitted a letter to HSM Anderson, writing:

> On 9/14/12, I was seen by Dr. [Suliene].  This was "scheduled" on 8/12/12 according to a blue slip that was returned to me. Also on that slip it says that I should continue with the SALSALATE that was prescribed to me.  As I [am] sure you know I had a reaction to that medication because it is an NSAID.  Both the ICE here and in Madison agree with me that it was wrong of Dr. [Suliene] to have me take that medication. Today when I talked to her about what happened she told me that I didn't have "that bad of a reaction" to that SALSALATE even though it was documented that I WAS having "that bad of a reaction".  I pointed this out to her and she proceeded to tell me that people were lying for me.  This is not the case however and furthermore I would NEVER ask someone to lie for me.  Especially the officer who did the recording of the s[y]mptoms.  I don't know if she realized that she was accusing an officer of lying for an inmate when she made that statement or if she thought that I was referring to an inmate but in either case I don't appre[c]iate being called a li[a]r.
>
> She then proceeded to tell me that there was nothing wrong with my back and that I should work out more and keep taking Mapap.  I informed her that Mapap doesn't even take the edge off the pain and I am unable to work out because it hurts to even stand for any length of time.  You have stated in the past that if I still was having problems to put in a blue slip and a treatment plan would be decided upon. . . . .

(Ex. 500 (dkt. #35-1) 10-11.)  Anderson does not recall reviewing Jacob's September 14th letter, but she was not aware of any subsequent delay in treatment after his appointment that same day.

On September 24, 2012, Dr. Suliene responded to an Interview/Information Request and Jacob's letter by stating that she scheduled a physical therapy ("PT") evaluation, and that she had ordered amitriptyline for his back pain.  On September 27, 2012, Jacob also directed an Interview/Information Request to the HSM, writing:

> Thanks you for your timely response concerning my request for treatment for my back pain.  I look forward to meeting with PT to evaluate whats going on.  I need to point out however that I was prescribed Amatrippline (?spelling) while I was housed at DCI.  I did have a reaction to it.  I got dizzy and was unable to eat.  I believe there was more but I cant remember much of anything that happened while I was on it.  If you still want me to take it I will, I just want to inform you that it was already given to me and I did not do well on it.  If some other medication could be tried I would prefer giving that a shot before I try something that I had problems with again.

(Ex. 500 (dkt. 35-1) 14.)  Dr. Suliene responded to Jacob's September 27 request that same day, asking if he wanted to go back to taking gabapentin rather than amitriptyline.

On October 14, 2012, Jacob also submitted an HSR, asking for a different medication because (1) the amitriptyline made it difficult for him to wake up and (2) he was experiencing dizzy spells.  The next day, Dr. Suliene responded that she would decrease the amitriptyline dose to 10 mg, to see if that would be better.  On November 5, Jacob had an initial evaluation with physical therapy, receiving a plan of care that would consist of six visits.  However, the Physical Therapy Progress Notes show that Jacob only attended two, subsequent physical therapy sessions -- one on January 30 and the second on February 8, 2013.

On November 14, 2012, Jacob submitted a letter to HSM Anderson, relaying his recent interactions with Dr. Suliene and asking if there were anything else he could do to

12

control his pain.  (Ex. 500 (dkt. #35-1) 27.)  On November 22, 2012, Anderson responded, advising Jacob that:  he could still take Tylenol, which was available through the canteen; and he could also submit an HSR to see nursing staff about his back pain.  Finally, Anderson advised him that physical therapy and an increase in activity would help his pain. (*Id.*)

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Defendants seek judgment in their favor on the merits of plaintiff's claims or, alternatively, on qualified immunity grounds.

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical

13

condition and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Defendants seek judgment with respect to the deliberate indifference element.

Proof of "deliberate indifference" is a high standard for a plaintiff to meet because it requires evidence that the official was both aware that the prisoner faced a substantial risk of serious harm and disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). The standard requires proof of *more than* negligent or even grossly negligent acts, although it requires something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). At summary judgment, the threshold for deliberate indifference is met where a reasonable jury could find that: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference, yet deliberately fails to take reasonable steps to avoid it. *Id.* at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense"). In particular, a jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at]

14

decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

### A.    Dr. Suliene

Dr. Suliene claims to have exercised reasonable and appropriate medical judgment in managing plaintiff's chronic back pain, including prescribing plaintiff Salsalate.   In opposition, plaintiff maintains that Dr. Suliene failed to exercise medical judgment in prescribing him Salsalate and in handling his complaints about that prescription, and further that she otherwise mismanaged his chronic lower back pain, which left him with unnecessary pain.  Apart from Dr. Suliene's decisions related to the Salsalate prescription between April and July of 2012, Dr. Suliene is plainly entitled to summary judgment. However, factual disputes related to Dr. Suliene's decision to prescribe Salsalate in April of 2012 preclude summary judgment.   Specifically, accepting as true plaintiff's representation that he reported to Dr. Suliene in April of 2012, as the court must, a jury might infer that Dr. Suliene acted with deliberate indifference in prescribing Salsalate, and again in failing to take any action when plaintiff communicated confusion and fear about that medication.  Although not a specific cause of injury, a jury might reasonably find further evidence of indifference in Dr. Suliene's continuing to offer Salsalate for pain relief even after plaintiff took it and suffered a severe adverse reaction.

As an initial matter, the parties dispute what Dr. Suliene actually knew about plaintiff's NSAID intolerance as of April 17, 2012. Defendants point out that plaintiff has not submitted evidence disputing Dr. Suliene's assertion that the DOC-3020 form did not include "/Salsalate" as of that appointment, but plaintiff *also* attests in his second declaration that he specifically *told* Dr. Suliene that he could not tolerate Salsalate at that appointment *and* asked her to check his medical records to confirm this, yet she prescribed it anyway. Therefore, there is a genuine dispute as to exactly what Dr. Suliene knew about plaintiff's inability to tolerate Salsalate when she prescribed it.

Defendants also argue that this dispute is of no moment, since Dr. Suliene opines that an intolerance to NSAIDs can both ease or go away over time and vary significantly in degree. Accordingly, she believed at that time that plaintiff could try out Salsalate, at least at a low dose to determine whether he could tolerate it. In particular, defendants direct the court to the Seventh Circuit's reasoning in *Burton*, 805 F.3d at 785-86, which reiterated that a patient's, or even another physician's, disagreement about a pain medication choice does not alone support a finding of deliberate indifference. *Id.* Yet Dr. Suliene's and plaintiff's disagreement about whether Salsalate should have been prescribed is not about plaintiff's *preference* not to take that medication, but whether it was *dangerous* for him to do so.

Given that even Dr. Suliene agreed plaintiff should not take Salsalate once she acknowledges learning of his bad reaction to it, plaintiff's insistence that she *was* aware of the extent of his intolerance in April permits an inference that she failed to exercise medical judgment at that point. Furthermore, even assuming that Dr. Suliene was reasonable in

16

her belief that plaintiff could *try* the Salsalate to determine whether his intolerance remained, there is no suggestion that she actually explained this to plaintiff or made any effort to probe into the details of plaintiff's past experience taking Salsalate to determine whether this was a feasible and safe option.  On the contrary, Suliene attests that she was not even aware of plaintiff's severe reaction to Salsalate, much less exercised any medical judgment in prescribing it anyway.  Regardless, the absence of any evidence indicating that she had such a discussion with plaintiff could further support a reasonable jury's inference of a lack of medical judgment, both because it could have avoided plaintiff's adverse reaction altogether and the evidence shows that plaintiff appears at best to have left that conversation confused and in fear about whether he should take the Salsalate as prescribed.

Dr. Suliene's dismissal of plaintiff's May 7, 2012, letter only exacerbates the problem.  Plaintiff explicitly relayed an instance in which he ended up in the hospital after taking Salsalate, but *also* said that he would take the medication if no one advised him otherwise.  Even then, Dr. Suliene maintains that she opted not to take *any* action because plaintiff had the choice not to take the Salsalate,[2] and he had access to other interventions to address his back pain, including Tylenol, weight loss and access to physical therapy.  However, Dr. Suliene does not attest to whether she considered the risk that plaintiff could harm himself if no one responded to his concern about taking Salsalate.  At the very least, it would seem reasonable for a jury to question Dr. Suliene's failure to react in *some* manner to plaintiff's letter, given: (1) plaintiff's assertion that he already told Dr. Suliene that he

---

[2]  Plaintiff contends that the HSU required him to take the Salsalate if he wanted treatment, but he provides no evidence of such a policy, and Dr. Suliene attests to being unaware of such a policy.

had an intolerance to Salsalate; (2) plaintiff's detailing of a prior serious reaction to Salsalate; and (3) plaintiff's clear confusion about whether to take Salsalate again. Certainly some action would have seemed appropriate when plaintiff took the Salsalate as prescribed on June 15, 2012, he suffered similar symptoms that he had described in the May 7 letter, or at least a reasonable jury might so find.

Accordingly, Dr. Suliene is not entitled to summary judgment with respect to her decision to prescribe plaintiff Salsalate in the first place in April of 2012, as well as her failure to follow up with plaintiff when he expressed concern and confusion about whether to take it in May of 2012. Further, the factual disputes related to her knowledge preclude judgment in her favor on qualified immunity grounds. *See Gutierrez v. Kernon*, 722 F.3d 1003, 1010-14 (7th Cir. 2013) (denying interlocutory appeal because qualified immunity defense turned on disputed facts).

That said, the balance of Dr. Suliene's handling of plaintiff's chronic low back pain does not support a finding of deliberate indifference. During their September 14, 2012, meeting, in addition to discussing plaintiff's Salsalate intolerance, Dr. Suliene made a plan for plaintiff to manage his chronic lower back pain with APAP and physical therapy, encouraging him to exercise. Although plaintiff again requested a second mattress, it is undisputed that Dr. Suliene did not have the ability to provide him another mattress. In any event, due to Dr. Suliene's orders from April, at that point plaintiff had been provided both a thick mattress and a low bunk.

Plaintiff's subsequent complaint to Anderson about Dr. Suliene's handling of the September 14 appointment is evidence of his disagreement with Dr. Suliene's judgment

18

about how to manage his pain, but not of deliberate indifference.  *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)); *see also Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (while a prisoner is entitled to reasonable measure to prevent a risk of harm, he "is not entitled to the best care possible").  Although plaintiff claims that he remained in pain, it is undisputed that Dr. Suliene ensured that other interventions were available to him, including Tylenol, the low bunk, thick mattress and physical therapy. Plaintiff has not come forward with evidence suggesting that Dr. Suliene's failure to prescribe him another medication at that point, amounted to a failure to exercise medical judgment.

Finally, later in September and into October, Dr. Suliene attempted to work with plaintiff when he wrote again requesting another pain medication because the APAP was insufficient.  At that point, she prescribed him amitriptyline, lowering the dosage when plaintiff reported adverse side effects, and she later suggested that plaintiff try gabapentin in an apparent effort to meet plaintiff halfway in terms of providing an additional pain management medication.  Although plaintiff reported dizziness and trouble waking up in response to the amitriptyline, then declined to try gabapentin again because of previous gastrointestinal side effects, no evidence of record suggests that Dr. Suliene *knew* that plaintiff would have an adverse reaction to these medications and suggested them nonetheless, unlike the disputed record as to her knowledge of plaintiff's sensitivity to

19

Salsalate.   Rather, Dr. Suliene continued to respond directly to plaintiff's continuing complaints of pain.

Thus, a jury will have to determine whether Dr. Suliene's April and May decisions involving plaintiff's Salsalate prescription amounted to deliberate indifference, but Dr. Suliene is entitled to judgment in her favor with respect to her other decisions related to managing plaintiff's chronic low back pain.


**B.    HSM Anderson**

Nurse Anderson seeks summary judgment because: (1) for the most part, she was not involved in plaintiff's medical treatment related to his NSAID intolerance and back pain; and (2) the few instances in which she was involved -- responding to Jacob's May 7, July 16, September 14 and November 14 letters -- did not amount to deliberate indifference.   Plaintiff argues in opposition that Anderson was aware of his intolerance to Salsalate and had an obligation to do more to ensure that he avoided an adverse reaction, as well as ensure that his chronic back pain was being treated.   However, the record establishes that Anderson's involvement with plaintiff's care was indeed quite limited. Moreover, when she was personally involved in plaintiff's care, she was entitled to defer to Dr. Suliene's medical judgments.

As a general matter, Anderson cannot be held liable for the actions of other HSU staff, simply by virtue of her role as HSM.   To be held liable under § 1983, a plaintiff must prove the defendant's personal participation or direct responsibility for the constitutional deprivation.   *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren*

*Cty.*, 830 F.3d 464, 469 (7th Cir. 2016).  More specifically, "a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728).  Furthermore, "[s]ection 1983 does not establish a system of vicarious responsibility.  Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (citation omitted).  Accordingly, "for a supervisor to be liable, they must be 'personally responsible for the deprivation of the constitutional right.'" *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)).  To establish personal involvement, the supervisor must "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).

This limitation applies to plaintiff's May 7, 2012, letter in particular.  Plaintiff has not submitted evidence disputing Anderson's statement that she does not recall reviewing the letter nor the evidence of record indicating that her only involvement would have been passing the letter on to Dr. Suliene for her to act.  To the contrary, the evidence is that the May 7th letter likely would have been handled by the triage nurse assigned on the day received, and even assuming that Anderson forwarded the letter to Dr. Suliene, in her role as HSM and nurse, it was perfectly appropriate for her to pass on plaintiff's concerns about the Salsalate prescription to the prescribing physician, since she lacked the authority to modify Dr. Suliene's prescription and plaintiff was specifically asking questions about her decision to order the Salsalate.  *See Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006)

(prison health administrator, who was also a nurse, could defer to doctor's decisions), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

In fairness, Anderson *might* be held liable if she were aware that Dr. Suliene's *subsequent* handling of plaintiff's letter was clearly problematic, and she failed to take corrective action, *see Rice ex rel Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) (nurses are entitled to rely on judgment of physicians but may "not unthinkingly defer to physicians and ignore obvious risks to [an inmate's] health"), but the evidence here does not suggest that plaintiff alerted Anderson to Dr. Suliene's failure to respond to his letter.  Therefore, there is no evidentiary basis upon which to infer that Anderson was personally involved in the lack of response to plaintiff's May 7 letter and her involvement in plaintiff's inmate complaint and her specific responses to plaintiff's letters do not support a finding of deliberate indifference.

Similarly, although the record shows that Anderson later provided ICE information about the events that took place on June 15, 2012, plaintiff has offered *no* evidence disputing Anderson's statement that she was not involved in responding to plaintiff's report of an adverse reaction to Salsalate that day.  Again, in fairness to plaintiff, Anderson's involvement in the investigation of the inmate complaint suggests that by the end of June, she was aware of plaintiff's Salsalate intolerance, and it does not appear that Anderson alerted Dr. Suliene or another physician to plaintiff's adverse reaction.  However, plaintiff has not submitted evidence that Anderson had reason to believe that plaintiff would continue taking Salsalate after that event, so her failure to take such an affirmative step might support a finding of negligence or possibly gross negligence, but not deliberate

indifference.

Furthermore, in July, when plaintiff *did* raise a concern that Dr. Suliene was still recommending Salsalate and offering gabapentin, Anderson responded by directing plaintiff *away* from taking Salsalate or gabapentin, recommending instead that he take APA three times daily and follow up with an HSR if he still had concerns.  Although Anderson does not remember how she came up with this recommendation, there is no evidence disputing her belief that she would have consulted a physician about recommending that he take three APAP daily.  Moreover, this recommendation was also consistent with the approach Dr. Suliene took in September.  Given that Anderson's recommendation served to avoid another adverse action, and Anderson lacked the authority to prescribe plaintiff a *new* medication, it would be unreasonable for a jury to infer that she responded to plaintiff's July 16th letter with deliberate indifference.

The same is true with respect to plaintiff's challenges to Anderson's responses to his September 14 and November 14, 2012, letters.  In both instances, plaintiff complained that the medication he was receiving for his low back pain -- Tylenol -- was inadequate.  At that point, however, plaintiff's treating physicians had tried other interventions that plaintiff unfortunately reported he also could not tolerate.  As described in detail above, Dr. Suliene's handling of his intolerance is problematic because, if plaintiff is believed, she knowingly prescribed him a medication that would cause a painful reaction.  However, by September 14, Salsalate was no longer being prescribed, and Dr. Suliene had moved on to trying other medications that plaintiff reported had adverse effects.  At that time, there was no evidence of record suggesting that Anderson had reason to believe that Dr. Suliene's

treatment of plaintiff's lower back pain -- which included other interventions and advice to engage in physical therapy and exercise -- was problematic.   Therefore, Anderson's deferring to Dr. Suliene's treatment plan does not begin to support a finding of deliberate indifference.   Accordingly, Anderson is entitled to summary judgment in her favor, and she will be dismissed from this lawsuit.

ORDER

IT IS ORDERED that:

1) Defendants Anderson and Suliene's motion for summary judgment (dkt. #30) is GRANTED in part and DENIED in part as set forth above.

2) Defendant Anderson is DISMISSED from this lawsuit.

Entered this 12th day of April, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

24